No. 25-70015

IN THE

# United States Court of Appeals for the Fifth Circuit

BLAINE KEITH MILAM,

*Plaintiff–Appellant,*

v.

MICHEAL E. JIMERSON,

*Defendant–Appellee.*

On Appeal from the United States District Court
for the Eastern District of Texas, Tyler Division

## DEFENDANT–APPELLEE'S BRIEF
## AND OPPOSITION TO MOTION FOR STAY OF EXECUTION

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals Division
Assistant Attorney General/
Assistant District Attorney
State Bar No. 24007052
    *Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936–1400
Tomee.heining@oag.texas.gov

*Counsel for Defendant–Appellee*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Defendant–Appellee*
    Micheal E. Jimerson
    RUSK COUNTY AND DISTRICT ATTORNEY

*Counsel for Defendant–Appellee*
    Tomee M. Heining
    Chief, Criminal Appeals Division
    Assistant Attorney General/
    Assistant District Attorney
    OFFICE OF THE ATTORNEY GENERAL OF TEXAS

*Plaintiff–Appellant*
    Blaine Keith Milam

*Counsel for Plaintiff–Appellant*
    Jeremy Schepers
    Supervisor, Capital Habeas Unit
    OFFICE OF THE FEDERAL PUBLIC DEFENDER

    Emily Follansbee
    Jared Tyler
    TEXAS DEFENDER SERVICE

                    s/ Tomee M. Heining
                    TOMEE M. HEINING
                    Chief, Criminal Appeals Division
                    Assistant Attorney General/
                    Assistant District Attorney

i

## STATEMENT REGARDING ORAL ARGUMENT

Because there is little time before Plaintiff–Appellant's scheduled execution, and because the parties' briefs adequately lay out the facts and legal arguments, the decisional process would not be significantly aided by oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .........................................i

STATEMENT REGARDING ORAL ARGUMENT ...................................ii

TABLE OF CONTENTS...................................................................iii

TABLE OF AUTHORITIES ........................................................... v

INTRODUCTION ...................................................................... 1

STATEMENT OF JURISDICTION.................................................. 2

STATEMENT OF ISSUES............................................................ 2

STATEMENT OF THE CASE ..................................................... 3

    I.    Statement of facts ......................................................... 3

    II.    Procedural History...................................................... 4

    III.    Facts Relevant to the Instant Proceedings ................... 6

SUMMARY OF THE ARGUMENT ............................................... 12

STANDARD OF REVIEW........................................................... 14

ARGUMENT ......................................................................... 14

    I.    The District Court Properly Dismissed Milam's Complaint Because It Failed to State a Claim for Which Relief is Available...................................................................... 14

        A. Texas's postconviction discovery process............................ 15

        B. Milam fails the *Osborne* test ................................. 19

C. Milam does not have a plausible actual innocence claim based on the DNA evidence at-issue ................................... 25

II.     Milam Cannot Evade His Complaint's Procedural Defects ...... 31

A. The relief Milam seeks equates to impermissible mandamus ................................................................. 32

B. Milam's lawsuit is time-barred ............................................. 35

C. The *Rooker-Feldman* doctrine precludes relief ..................... 37

III.    The Court Should Deny a Stay of Execution ............................. 39

A. Fifth Circuit Rule 8.1.2 .......................................................... 39

B. The relevant considerations weigh against granting Milam a stay of execution ...................................................... 40

CONCLUSION ........................................................................................ 45

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................... 46

CERTIFICATE OF COMPLIANCE WITH ECF FILING STANDARD ........................................................................................ 47

CERTIFICATE OF SERVICE ................................................................ 47

# TABLE OF AUTHORITIES

## Cases

*Adams v. Thaler*, 679 F.3d 312 (5th Cir 2012) ........................................ 41

*Alvarez v. Attorney General for Fla.*, 679 F.3d 1257 (11th Cir. 2012).... 23

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ................................................. 41

*Barr v. Lee*, 591 U.S. 979 (2020) .............................................................. 43

*Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................. 14

*Benchoff v. Fogal*, 576 F. App'x 117 (3d Cir. 2014) ................................ 38

*Bracy v. Gramley*, 520 U.S. 899 (1997)..................................................... 23

*Bucklew v. Precythe*, 587 U.S. 119 (2019) ................................................ 43

*Conner v. Texas Court of Criminal Appeals*,
 481 F. App'x 952 (5th Cir. 2012) ............................................................. 33

*Cromartie v. Shealy*, 941 F.3d 1244 (11th Cir. 2019)............................. 20

*Davis v. Scott*, 157 F.3d 1003 (5th Cir. 1998) .................................... 14, 32

*District Attorney's Office v. Osborne*, 557 U.S. 52 (2009) ...............Passim

*District of Columbia Court of Appeals v. Feldman*,
 460 U.S. 476 (1983)........................................................................Passim

*Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996) .................. 24

*Ex parte White*, 506 S.W.3d 39 (Tex. Crim. App. 2016) ......................... 16

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
 544 U.S. 280 (2005).................................................................................. 37

*Hill v. McDonough*, 547 U.S. 573 (2006) ....................................40, 41, 43

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ................................. 41

*In re Embry*, No. 5-16–00211–CV, 2016 WL 1179545,
 (Tex. App.—Dallas Mar. 28, 2016, no pet.)............................... 16

*In re Heaney*, No. 03–16–00491–CV, 2016 WL 4272125,
 (Tex. App.—Austin Aug. 9, 2016, no pet.)................................ 16

*In re Sorrow*, No. 14–16-00054–CR, 2016 WL 446858,
 (Tex. App.—Houston [14th Dist.] Feb. 4, 2016, no pet.) ..................... 16

*In re State ex rel. Hicks*, No. WR-95,092-01, 2023 WL 6074482,
 (Tex. Crim. App. Sept. 18, 2023)........................................... 17

*In re TDCJ*, 710 S.W.3d 731 (Tex. Crim. App. 2025) ............17, 18, 19, 20

*Johnson v. Collier*, 137 F.4th 376 (5th Cir. 2025) ................................34

*Johnson v. De Grandy*, 512 U.S. 997 (1994) ...........................................38

*Lance v. Dennis*, 546 U.S. 459 (2006) .......................................................38

*Lee v. State*, No. 12–0–00272–CR, 2003 WL 292320,
 (Tex. App.—Tyler Feb. 12, 2003, no pet.) ................................ 16

*Morrison v. Peterson*, 809 F.3d 1059 (9th Cir. 2015)..............................23

*Moye v. Clerk, DeKalb Cty. Superior Court*,
 474 F.2d 1275 (5th Cir. 1973) ................................................33

*Murphy v. Johnson*, 205 F.3d 809 (5th Cir. 2000)..................................23

*Nelson v. Campbell*, 541 U.S. 637 (2004) ....................................40, 41, 42

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................................41

*Ochoa v. Collier*, 802 F. App'x 101 (5th Cir. 2020) .................................. 34

*Price v. Dunn*, 587 U.S. 999 (2019) ......................................................... 44

*Pruett v. Choate*, H-17-2418, 2017 WL 4277206,
 (S.D. Tex. Sept. 25, 2017) ...................................................................... 33

*Pruett v. Choate*, 711 F. App'x 203 (5th Cir. 2017) ................................. 12

*Pruett v. State*, No. AP–77,065, 2017 WL 1245431,
 (Tex. Crim. App. Apr. 5, 2017) ............................................................... 16

*Reed v. Goertz*, 136 F.4th 535 (5th Cir. 2025) ....................... 14, 19, 20, 22

*Reed v. Goertz*, 598 U.S. 230 (2023) .................................................. 35, 36

*Rodriguez v. Holmes*, 963 F.2d 799 (5th Cir. 1992) ................................. 35

*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) ........................... Passim

*Russell v. Bd. of Trustees*, 968 F.2d 489 (5th Cir. 1992) ........................ 35

*Skinner v. Switzer*, 562 U.S. 521 (2011) .................................................. 20

*Staley v. State*, 420 S.W.3d 785 (Tex. Crim. App. 2013) ......................... 16

*State v. Patrick*, 86 S.W.3d 592 (Tex. Crim. App. 2002) ......................... 15

*Teague v. Quarterman*, 482 F.3d 769 (5th Cir. 2007) .............................. 13

*Total Gas & Power N. Am., Inc. v. Fed. Energy Regulatory Comm'n*,
 859 F.3d 325 (5th Cir. 2017) .................................................................. 14

*United States v. Vialva*, 976 F.3d 458 (5th Cir. 2020) ............................ 42

*Vela v. Ogg*, No. H-22-0803, 2022 WL 2785914,
 (S.D. Tex. June 8, 2022) ......................................................................... 34

*Whitaker v. Collier*, 862 F.3d 490 (5th Cir. 2017)....................................35

## Statutes

Tex. Code Crim. art. 11.071 ............................................................Passim

Tex. Code Crim. art. 11.073 ....................................................... 4, 31

Tex. Gov. Code § 411.153.................................................................... 8

28 U.S.C. § 1291 ............................................................................... 2

28 U.S.C. § 2244 .............................................................................22

42 U.S.C. § 1983.......................................................................Passim

## Rules

Fed. R. App. Proc. 32 ................................................................... 46

Fed. R. Civ. Proc. 12 ..................................................................... 11

Fifth Cir. R. 8.1.2 ..........................................................................39

Fifth Cir. R. 25.2.13 .....................................................................47

Fifth Cir. R. 28.2.1 .......................................................................... i

Tex. Code Crim. Proc. 64 .....................................................12, 13, 17, 37

## Constitutional Provisions

U.S. Const. amend. VII...................................................................5

U.S. Const. amend. XIV..............................................................1, 5

## INTRODUCTION

Petitioner-Appellant Blaine Keith Milam was convicted and sentenced to death for the murder of his fiancée's thirteen-month-old daughter, Amora Bain Carson. Amora was severely beaten, strangled, sexually mutilated with a foreign object, and had twenty-four human bitemarks covering her entire body. Milam is scheduled to be executed **after 6:00 p.m. (CDT) on Thursday, September 25, 2025.**

Milam has unsuccessfully challenged his conviction and death sentence in both state and federal court. Upon receiving his most-recent execution date—his third, Milam requested Rusk District and County Attorney Micheal Jimerson obtain for him DNA and serology records from the Southwestern Institute of Forensic Sciences (SWIFS). Jimerson declined the dilatory request, and Milam filed a motion in the trial court for discovery of the SWIFS records. ROA.51–59. The trial court denied Milam's motion. ROA.88.

Milam subsequently filed a complaint in federal district court under 42 U.S.C. § 1983, asserting a due process violation under the Fourteenth Amendment and seeking relief that would require Jimerson to produce the SWIFS records. ROA.4–19. Jimerson filed a motion to dismiss

Milam's complaint. ROA.91–129. On August 29, 2025, the district court granted Jimerson's motion and dismissed Milam's complaint with prejudice. ROA.226–41. Milam now appeals the district court's decision.

For the reasons discussed below, this Court should affirm the district court's dismissal of Milam's complaint. Furthermore, Milam's request for a stay should be denied—he did not request one in the court below and equitable considerations weigh against his request.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over Milam's appeal pursuant to 28 U.S.C. § 1291 but is without jurisdiction to grant Milam the relief he requests.

## STATEMENT OF THE ISSUES

1.  Whether a Texas capital murderer has a due-process right, enforceable via a § 1983 civil-rights action, to compel a state officer to obtain and turn over DNA and serology records years after his conviction and appeals are final?

2.  Whether Milam is entitled to a stay of execution when he has been unjustifiably dilatory in seeking relief and his underlying claims are patently meritless?

## STATEMENT OF THE CASE

### I.    Statement of Facts

This Court previously summarized the facts and evidence underlying Milam's capital murder conviction in its prior opinion denying a certificate of appealability (COA) as follows:

> Milam was charged with capital murder for the death of Amora Bain Carson. During the guilt phase of his jury trial, the State's evidence showed that Amora died from homicidal violence, due to multiple blunt-force injuries and possible strangulation. A search of Milam's trailer, the scene of the murder, revealed blood-spatter stains consistent with blunt-force trauma, blood-stained bedding and baby clothes, blood-stained baby diapers and wipes, a tube of Astroglide lubricant, and a pair of jeans with blood stains on the lap. DNA testing showed that the blood on these items was Amora's. Milam's sister visited Milam in jail a few days after the murder, and that night she told her aunt that she needed to get to Milam's trailer because Milam told her to get evidence out from underneath it. Milam's aunt called the police, who immediately obtained a search warrant and, in a search underneath the trailer, discovered a pipe wrench inside a clear plastic bag that had been shoved down a hole in the floor of the master bathroom. Forensic analysis revealed components of Astroglide on the pipe wrench, the diaper Amora had been wearing, and the diaper and wipes collected from the trailer. The State also proffered testimony from Shirley Broyles, a nurse at the Rusk County Jail, who testified that Milam told her, "I'm going to confess. I did it. But Ms. Shirley, the Blaine you know did not do this. My dad told me to be a man, and I've been reading my Bible. Please tell Jesseca [Amora's mother] that I love her." The jury convicted Milam of capital murder[.]

*Milam v. Davis*, 733 F. App'x 781, 782 (5th Cir. 2018) (citation omitted).

## II.    Procedural History

The Texas Court of Criminal Appeals (CCA) affirmed Milam's conviction and sentence on direct appeal. *Milam v. State,* No. AP-76,379, 2012 WL 1868458, at *21 (Tex. Crim. App. May 23, 2012). He did not seek certiorari review. The CCA subsequently denied state habeas relief. *Ex parte Milam,* No. WR-79,322-01 (Tex. Crim. App. Sept. 11, 2013).

A federal district court later denied Milam federal habeas relief and a COA. *Milam v. Director, TDCJ-CID,* No. 4:13-cv-545, 2017 WL 3537272, at *51 (E.D. Tex. Aug. 16, 2017). This Court also denied Milam's request for a COA. *Milam v. Davis,* 733 F. App'x 781 (5th Cir. 2018), *cert. denied,* 139 S. Ct. 335 (2018).

On January 7, 2019, eight days before his first scheduled execution date, Milam filed his second state habeas application—his first subsequent writ—and a motion for a stay. On January 14, 2019, the CCA granted the stay pursuant to Texas Code of Criminal Procedure Article 11.071 § 5(a)(1), and remanded two claims for merits adjudication by the trial court: (1) whether Milam is entitled to relief under Article 11.073 of the Texas Code of Criminal Procedure because the current

relevant scientific evidence related to the reliability of the bitemark comparison contradicted expert opinion testimony presented and relied upon by the State at trial; and (2) whether Milam's execution would violate the Eighth and Fourteenth Amendments because he is intellectually disabled. *Ex parte Milam*, No. WR-79,322-02, 2019 WL 190209, *1 (Tex. Crim. App. Jan. 14, 2019). The CCA adopted the trial court's recommended denial of relief on July 1, 2020. *Ex parte Milam*, 2020 WL 3635921, at *1 (Tex. Crim. App. July 1, 2020), *cert denied*, *Milam v. Texas*, 141 S. Ct. 1402 (2021). Milam's federal appeal was unsuccessful. *See In re Blaine Milam*, 838 F. App'x 796, 798–800 (5th Cir. 2020) (unpublished); *In re Milam*, No. 20-40849 c/w No. 20-70024, 832 F. App'x 918 (5th Cir. 2021), *cert. denied*, *Milam v. Lumpkin*, 142 S. Ct. 172 (2021). The trial court reset Milam's execution date for January 21, 2021.

On January 15, 2021, the CCA stayed Milam's execution again and remanded a second subsequent writ application to the trial court for merits review of an intellectual disability claim. *Ex parte Milam*, No. 79,322-04, 2021 WL 197088, at *1 (Tex. Crim. App. Jan. 15, 2021). Following court-ordered reexamination by a new expert—which Milam opposed—and a two-day evidentiary hearing in the trial court, the CCA

adopted the trial court's recommendation and again denied relief. *Ex parte Milam*, No. 79,322-04, 2024 WL 3595749, at *1 (Tex. Crim. App. July 31, 2024), *cert. denied*, *Milam v. Texas*, 145 S. Ct. 1334 (2025). On May 21, 2025, the trial court signed an order setting Milam's third execution date for September 25, 2025.

## III.  Facts Relevant to the Instant Proceeding

On June 30, 2015, while Milam's first federal habeas petition was still pending, the Texas Department of Public Safety (DPS) issued a statement acknowledging errors in the FBI database used by DPS and other crime laboratories for calculating match statistics in criminal investigations since 1999. *See* ROA.131. In the same letter, DPS offered to recalculate statistics previously reported in individual cases if requested in writing. ROA.131. On July 22, 2015, the undersigned emailed a copy of this statement to Milam's federal habeas counsel of record, Don Bailey, Jeff Haas, and Scott Smith, but no recalculation was requested. ROA.130–31.[1]

---

[1]    In his motion for stay, Milam contends that the State withheld a similar notification letter from SWIFS, sent in March 2016. DE20-1 at 6. The State did receive a similar notification letter, but it is unclear whether the State, or any other entity, shared the 2016 SWIFS letter with Milam. The State believed that notification to Milam's counsel had already been provided through the

In 2018, Milam was appointed new federal habeas counsel—the Federal Public Defender's Office of the Northern District of Texas (FPDO). *See* ROA.10. In December 2018, the FPDO reviewed the prosecution files retained by the Office of the Attorney General (OAG), which assisted in the prosecution of Milam's case, and obtained portions of the SWIFS DNA records. *See id.*

In Milam's § 1983 complaint, referring to the records obtained from the State's files, he alleged that "[t]he limited DNA records currently available reflect that SWIFS inconsistently applied its DNA testing protocols to the biological evidence in Milam's case, reflecting a biased testing strategy," and "[a]ccess to the complete DNA records could help Milam prove that SWIFS's conclusions that Milam could not be excluded as a contributor to these samples are so unreliable that they should not have been admitted at trial." ROA.14–15. But Milam did not request a complete copy of these records from SWIFS until September 9, 2024—

---

undersigned counsel's sharing of the DPS letter in July 2015, and responded to SWIFS accordingly. Milam contends he did not have notice of the need for reinterpretation until apparently some time in 2024, because his DNA testing was done through SWIFS, not DPS. But Milam was clearly put on notice of potential problems with the DNA evidence through the DPS letter, as well as the nationwide notoriety of this issue in general, which caused sweeping reforms in the methodology utilized by SWIFS and other laboratories. Milam cannot credibly contend he was unaware of this issue until 2024.

over nine years after he could have requested a reinterpretation of the DNA evidence in his case and two subsequent state habeas writs were filed and relief denied. *See* ROA.12–13. SWIFS denied Milam's request because the records at-issue were confidential by state law and could not be disclosed. *See* Tex. Gov. Code § 411.153(a); *see also* ROA.13, 167–69.[2]

It was not until after the State filed a motion seeking the third setting of Milam's execution date did Milam request a complete copy of the SWIFS records from the Rusk District and County Attorney, Micheal Jimerson. Given the dilatory timing of the request, Jimerson declined to request a copy of the records from SWIFS for Milam's counsel. *See* ROA.13–14.

On April 16, 2025, Milam filed a motion in the trial court for discovery of DNA and serology records maintained by SWIFS. ROA.51–59. The State opposed on grounds that the trial court lacked jurisdiction

---

[2]    In his motion for stay, Milam asserts he requested DNA files from the State in 2018. DE20, at 6. The State is unaware of a specific request for DNA files in 2018. It is unclear whether this request was in conjunction with the request to review the State's files. In his more definite statement before the district court Milam asserts that he obtained 162 pages of records directly from SWIFS pursuant to a PIA request in 2019, but suggests SWIFS withheld other records after obtaining a ruling from the OAG. *See* DE18 at 13 (citing ROA.44). He cites no supporting documentation for these requests, and it is unclear whether the OAG ruling he is referring to is the 2024 OAG ruling or another. *See id.* at 19–20.

to grant postconviction discovery when no proceeding was pending before the court. ROA.61–77. The trial court denied Milam's motion on May 21, 2025. ROA.88.

On July 3, 2025, Milam filed a complaint with the Texas Forensic Science Commission (TFSC) against SWIFS, concerning "laboratory results and testimony in the areas of serological testing and DNA analysis on samples collected from submitted evidence items and the body of the decedent" in this case. *See* ROA.132–36. On July 23, 2025, SWIFS issued a response to TFSC, addressing the concerns outlined in the complaint, finding all allegations of professional negligence or misconduct "unfounded." *See* ROA.137–45. Notably, SWIFS repeatedly asserted: "To date, no request has been received by the laboratory for reinterpretation of DNA profiles in this case. It is our emphatic recommendation that the defendant [Milam] request reinterpretation of the DNA evidence using the laboratory's revised procedures." ROA.138; *see also* ROA.141, 143, 144. On July 29, 2025, the TFSC dismissed Milam's complaint against SWIFS "because the laboratory has recognized the need for reinterpretation of the DNA evidence pursuant to current protocols upon the request of a party. This is in accordance

9

with the historical statewide DNA mixture review protocols adopted by the Commission for DNA mixture analyses performed during the time period(s) involved in the complaint." ROA.146.

On July 30, 2025—ten years after it was first offered by DPS—Milam's counsel finally requested reinterpretation of four DNA profiles. *See* ROA.147–50; ROA.164–66. Milam also requested copies of SWIFS protocols and procedures, the electronic data generated during the prior testing and interpretation of the four samples, and the names of the individuals conducting the reinterpretation and review. ROA.147–48. Milam also renewed his request for SWIFS's DNA case file. *Id.*

Because "standard procedure would be to reinterpret all DNA evidence in the case using SWIFS's updated guidelines for STR profile interpretation (issued 2/29/2016)," Stacy McDonald contacted Jimerson and undersigned counsel to see if Jimerson wanted SWIFS to review all the DNA evidence in Milam's case. ROA.164–66. Jimerson agreed. In an email to Milam's counsel, McDonald indicated that she would be conducting the reinterpretation and would issue a report. She provided copies of the laboratory protocols to be used to perform the reinterpretation. *Id.*

10

SWIFS completed its report on August 12, 2025. Review of the reinterpretation results corroborate the State's case against Milam. *See* ROA.176 (Milam included as contributor to swabs from Amora's body; Amora included as contributor to stain from Milam's jeans and a swabbing from his shirt). And although Jimerson did not initially have custody of SWIFS case file, SWIFS transmitted documents to Jimerson upon conducting its reinterpretation. *See* ROA.104, 164. Jimerson in turn disclosed those documents and the report to Milam that same day.[3]

On July 18, 2025, Milam filed his § 1983 complaint. He was ordered to file a more definite statement, which he subsequently filed on August 6, 2025. ROA.37–40, 43–50. On August 13, 2025, Jimerson filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Jimerson argued that the district court lacked jurisdiction to adjudicate Milam's complaint, and that Milam failed to state a claim for which relief could be granted. ROA.91–129.

---

[3]     The documents included over 4,000 pages of SWIFS's casefile. The documents were received by Jimerson after Milam filed his § 1983 complaint. Thus, they were disclosed while Milam's instant case was pending.

On August 29, 2025, the district court granted Jimerson's motion to dismiss and dismissed Milam's complaint with prejudice. ROA.226–41. On September 2, 2025, Milam filed a notice of appeal.[4] ROA.243–45.

## SUMMARY OF THE ARGUMENT

The district court properly granted Jimerson's motion to dismiss Milam's complaint. The district court reasoned that Milam's complaint did not state an adequate claim to challenge Chapter 64 of the Texas Code of Criminal Procedure. The district court further explained that a standalone post-conviction request for a federal court to compel a district attorney to produce DNA testing records sounds in mandamus, which the court lacked power to issue.

The district court correctly noted that because Texas has created a right to postconviction DNA testing via Chapter 64 of the Texas Code of Criminal Procedure, "the procedures to enforce that right must satisfy due process." ROA.235–36 (quoting *Pruett v. Choate*, 711 F. App'x 203, 206 (5th Cir. 2017)). The district court found that Milam did not state a claim for which relief can be granted as it pertains to Chapter 64.

---

[4]    Milam filed his third subsequent state habeas application—his fourth overall—on the same day. *See* Appellant's Brief (DE18) at 16.

ROA.236–39. Milam claims that the district court misconstrued his arguments. Regardless, to the extent Milam challenges Texas's postconviction procedures—excluding Chapter 64—this Court can affirm the district court's dismissal of his § 1983 complaint on any bases supported by the record. *Teague v. Quarterman*, 482 F.3d 769, 773 (5th Cir. 2007) ("We may affirm a district court's decision on any basis established by the record." (citation omitted)). In other words, even if Milam does not challenge Texas's Chapter 64, and instead challenges Texas's postconviction procedures more broadly, the Court can still affirm the district court's decision for the alternative reasons contained in Jimerson's brief, including: (1) the additional reasons cited by the Defendant as to why Milam's complaint fails to state a claim for which relief is available; (2) the untimeliness of Milam's complaint; and (3) the *Rooker-Feldman*[5] doctrine.

---

[5]    *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415 (1923) (holding that the jurisdiction of the district court is strictly original); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 476, 482 (1983) (holding a United States district court has no authority to review final judgments of a state court in judicial proceedings).

13

Finally, the Court should deny Milam's request to stay his impending execution date. He did not request a stay from the district court, and equitable considerations weigh against granting his motion.

## STANDARD OF REVIEW

Milam seeks review of the district court's final judgment dismissing his civil rights complaint. "To survive a motion to dismiss, a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Reed v. Goertz*, 136 F.4th 535, 542 (5th Cir. 2025) (quoting *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In this appeal, the district court's ruling is reviewed de novo, "applying the same standard as the district court." *Total Gas & Power N. Am., Inc. v. Fed. Energy Regulatory Comm'n*, 859 F.3d 325, 332 (5th Cir. 2017). Additionally, this Court "may affirm the district court's rulings on any basis supported by the record." *Id.*; *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998).

## ARGUMENT

## I.   The District Court Properly Dismissed Milam's Complaint Because It Failed to State a Claim for Which Relief is Available.

Milam argues that his due process rights are being violated because, while Texas has created a liberty interest by permitting him to

avoid execution by a showing of innocence, Texas's postconviction procedures do not grant him a meaningful way to do so. DE18 at 25–33 (citing *District Attorney's Office v. Osborne*, 557 U.S. 52, 68 (2009)). Milam solely relies on *Osborne* to support his claim that Texas's postconviction procedures deprive him of his right to due process. *See* DE18 at 25–33. But like Osborne, Milam's "attempt to sidestep state process through a new federal lawsuit puts [him] in a very awkward position." *Osborne*, 557 U.S. at 71. That is, even assuming arguendo that Milam has a valid liberty interest in demonstrating his innocence, he fails to show the State's discovery procedures are fundamentally inadequate to vindicate that interest because—in a glaring display of dilatoriness—he has utterly failed to take advantage of them.

## A.    Texas's postconviction discovery process

In Texas, a trial court is jurisdictionally limited in its ability to order postconviction discovery. "When a conviction has been affirmed on appeal and the mandate has issued, general jurisdiction is not restored in the trial court." *State v. Patrick*, 86 S.W.3d 592, 594 (Tex. Crim. App. 2002) (plurality op.). Rather, "[t]he trial court has special or limited jurisdiction to ensure that a higher court's mandate is carried out and to

perform other functions specified by statute, such as finding facts in a habeas corpus setting or . . . determining entitlement to DNA testing." *Id.* (citations omitted); *Ex parte White*, 506 S.W.3d 39, 51 (Tex. Crim. App. 2016); *Pruett v. State*, No. AP–77,065, 2017 WL 1245431, at *5 (Tex. Crim. App. Apr. 5, 2017) (not designated for publication) ("Once a trial court's general jurisdiction expires, it has only limited jurisdiction to carry out a higher court's mandate or to perform functions specified by law."). Jurisdiction derives from either the Texas Constitution or legislative enactments. *Staley v. State*, 420 S.W.3d 785, 795 (Tex. Crim. App. 2013) (citation omitted).[6]

---

[6] Various courts of appeals have likewise held that a trial court's jurisdiction is limited to the express language of a statute once the court has lost general jurisdiction. *In re Heaney*, No. 03–16–00491–CV, 2016 WL 4272125, at *1 (Tex. App.—Austin Aug. 9, 2016, no pet.) (not designated for publication) ("Heaney does not cite any authority, nor has our research revealed any, that supports his contention that the district court had jurisdiction, and therefore, a duty, to rule on his various post-conviction motions."); *In re Embry*, No. 5-16–00211–CV, 2016 WL 1179545, at *1 (Tex. App.—Dallas Mar. 28, 2016, no pet.) (not designated for publication) (after its plenary jurisdiction expired, the trial court lacked jurisdiction to consider relator's motion requesting court records); *In re Sorrow*, No. 14–16-00054–CR, 2016 WL 446858, at *1 (Tex. App.—Houston [14th Dist.] Feb. 4, 2016, no pet.) ("[I]n the absence of a statute providing the trial court with jurisdiction over relator's motion for new trial for a new fact found after judgment, the trial court does not have jurisdiction over relator's motion and no legal duty to rule on it."); *Lee v. State*, No. 12–0–00272–CR, 2003 WL 292320, at *1 (Tex. App.—Tyler Feb. 12, 2003, no pet.) (not designated for publication) (trial court lacked jurisdiction to issue an order for an in- camera inspection of evidence under

Relevant here, the CCA recently explained that a trial court's jurisdiction to authorize discovery must be predicated on a statutorily valid proceeding. In *In re TDCJ*, the defendant's conviction was final, his state habeas application had been disposed of, and there were no pending proceedings before the trial court. 710 S.W.3d 731, 734 (Tex. Crim. App. 2025). Despite this, the trial court entered a discovery order requiring TDCJ to provide access to the defendant for the purpose of obtaining a blood sample. *Id*. TDCJ then filed a petition for writ of mandamus, and the CCA concluded mandamus relief was warranted because the trial court's "lack of jurisdiction [was] indisputable." *Id*. ("Under that procedural posture, there is nothing to confer jurisdiction on the trial court[.]"), 735–36 ("Any jurisdiction a trial court obtains post-finality must be conferred by the Texas Constitution or by statute, and any provision bestowing post-finality jurisdiction defines the scope of that jurisdiction." (citation omitted)).; *see also In re State ex rel. Hicks*, No. WR-95,092-01, 2023 WL 6074482, at *2–3 (Tex. Crim. App. Sept. 18, 2023) (not designated for publication) (granting mandamus relief and

---

Chapter 64). The bottom line is that once a trial court loses general jurisdiction, it only gains it back by statute, and then its jurisdiction is limited to that expressly provided by the statute.

ordering trial court to rescind discovery order commanding the State to make its files available to the inmate's counsel because the trial court lacked jurisdiction to enter such an order).

Accordingly, for a Texas convicting court to re-acquire jurisdiction over a case and order discovery after it loses general jurisdiction, it must have statutory authorization to do so. For instance, a Texas trial court re-acquires jurisdiction and may order discovery during initial state habeas proceedings or when the CCA approves a subsequent state habeas application for merits adjudication. *In re TDCJ*, 710 S.W.3d at 737–38. A subsequent habeas application can be considered if certain enumerated qualifications are met. *See* Tex. Code Crim. Proc. art. 11.071 § 5. As the subsequent-habeas-application procedure relates to postconviction discovery, the CCA has explained:

> To the extent a habeas applicant might believe that discovery would help prove a claim that would meet a § 5 exception, such an applicant is not without a remedy. To obtain a remand to the trial court under § 5, an applicant must make a "prima facie showing," not prove his entire case. In such a prima facie showing, the habeas applicant must, in addition to showing previously unavailable evidence or law (or making a prima facie showing of meeting an innocence-gateway or punishment-gateway exception), "allege sufficient specific facts that, *if proven*, establish a federal constitutional violation sufficiently serious as to likely require relief from his conviction or sentence."

If a habeas applicant has a good faith basis for believing that discovery will yield evidence showing a constitutional violation, he can *file a subsequent habeas application* and allege in that application what discovery he needs, what he expects the discovery to show, why he expects the discovery to show it, and why he cannot get the evidence without the discovery order he seeks. He would also want to allege why the evidence was unavailable when he filed his previous application or what new law was unavailable or why he meets the innocence-gateway or punishment-gateway exception. This Court can then consider those allegations in determining whether the habeas applicant has established a prima facie case of meeting § 5 that would justify remanding the case to the trial court for further proceedings.

*In re TDCJ*, 710 S.W.3d at 738–39 (footnotes omitted).

## B.     Milam fails the *Osborne* test.

"The Constitution does not recognize a 'free-standing right to DNA evidence.'" *Reed*, 136 F.4th at 543 (quoting *Osborne*, 557 U.S. at 72). And since there is also no Texas postconviction right to discovery outside initial or authorized subsequent state habeas applications, Milam must necessarily argue that his liberty interest is begotten from various rights to assert actual innocence under state law and essential to the realization of those rights. *See* ROA.7. Yet, even assuming arguendo this liberty interest exists, Milam fails to show the "State's postconviction relief procedures . . . are fundamentally inadequate to vindicate the

substantive rights provided." *Osborne*, 557 U.S. at 69. Indeed, there is "'slim room for the prisoner to show that the governing state law denies him procedural due process.'" *Reed*, 136 F.4th at 543 (quoting *Skinner v. Switzer*, 562 U.S. 521, 525 (2011)); *see Cromartie v. Shealy*, 941 F.3d 1244, 1252 (11th Cir. 2019) ("Every court of appeals to have applied the *Osborne* test to a state's procedure for postconviction DNA testing has upheld the constitutionality of it."). Under *Reed* and *Osborne*, Milam fails to state a valid claim for relief even assuming that his facts are true.

*First*, as shown above, Texas has procedures for court-ordered discovery—Milam simply failed to avail himself of them. Milam could have requested discovery at trial when the convicting court had general jurisdiction over his case. He also could have raised an actual innocence claim based on DNA evidence in one of his previous subsequent state habeas applications and sought discovery. Nothing interfered with his ability to file another subsequent state habeas application and outline to the CCA what discovery he needs, what he expects the discovery to show, why he expects the discovery to show it, and why he could not get the evidence without the discovery he seeks. *See In re TDCJ*, 710 S.W.3d at 738–39.

Milam only recently—*after* his § 1983 complaint was dismissed—filed a subsequent state habeas application raising an actual innocence claim and seeking discovery of the materials at-issue here. While exhaustion is not a prerequisite in a case such as this one, Milam should not be permitted to complain about a state process that he had yet to invoke at the inception of his current lawsuit. *See Osborne*, 557 U.S. at 71 ("It is difficult to criticize the State's procedures when Osborne has not invoked them. . . . it is Osborne's burden to demonstrate the inadequacy of the state-law procedures available to him in state postconviction relief. These procedures are adequate on their face, and without trying them, Osborne can hardly complain that they do not work in practice." (citation omitted)). Milam thus has a problem of his own making—he had not taken advantage of the discovery procedures available to him. He was not statutorily or arbitrarily denied all discovery at the whim of the prosecutor.

***Second***, Milam offers no precedent holding that the Texas postconviction discovery scheme is fundamentally inadequate because it does not force district attorneys to agree to unbounded postconviction discovery. "[A]bsent some showing of bad faith or bad conduct, we cannot

see how committing the custody of potentially exculpatory evidence to the state is fundamentally inadequate to vindicate the right to the possibility of postconviction testing that it offers—especially given the Supreme Court's emphasis that the power to define these contours is vested in the state legislature." *Reed*, 136 F.4th at 545 (citing *Osborne*, 557 U.S. at 62). Moreover, "[i]t is not enough to disagree with how the state has elected to use its permissible discretion or to complain that it has misapplied its own standards. Instead, [Milam] would have to show that those standards are fundamentally unfair or unjust in some way." *Id.* at 546. Here, the State elected to use its permissible discretion to refuse a dilatory discovery request untethered from any pending proceeding. Fundamental fairness does not require the State to accede to an unwarranted fishing expedition on the eve of Milam's execution date, especially when the DNA evidence is of marginal value, as he admits. *See* DE18 at 7, 33.

**Third**, if Texas's postconviction procedures are unconstitutional, then so are the federal government's. Federal petitioners must receive circuit-level authorization before proceeding with new claims after their first writ proceeding. 28 U.S.C. § 2244(b). Even then federal petitioners

must demonstrate good cause for discovery. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000). One cannot overestimate the sweeping breadth of Milam's claim. He effectively says that he should be allowed to conduct unbounded discovery independent of court authorization—even a decade and more after trial—with no right of refusal from the State. There is no authority for such a limitless proposition. *Osborne*, 557 U.S. at 72 (noting that federal habeas discovery procedures are not inadequate); *see Morrison v. Peterson*, 809 F.3d 1059, 1068–69 (9th Cir. 2015) (rejecting challenge to California's forensic testing statute because Alaska's framework at issue in *Osborne* was "more restrictive, not less restrictive" than California's); *Alvarez v. Attorney General for Fla.*, 679 F.3d 1257, 1266 n.2 (11th Cir. 2012) ("In short, inasmuch as Florida's DNA access procedures either mirror or are more applicant-friendly than the Alaska and federal statutes endorsed in *Osborne*, Florida's postconviction DNA access procedures plainly do not offend [due process].").

**Fourth**, Texas's procedures are similar to the ones upheld in *Osborne*. In *Osborne*, the Supreme Court found no fault with Alaska's general procedures to vindicate its state right to postconviction relief or

even its specific treatment of DNA evidence. *Osborne*, 557 U.S. at 70. The Court noted that Alaska placed no time limits on DNA claims, and discovery was allowed in postconviction proceedings. Texas also recognizes a substantive actual innocence claim, has no statute of limitations for subsequent habeas applications, and allows postconviction factual development. *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996); Tex. Code Crim. Proc. art. 11.071 § 9. The *Osborne* Court additionally condoned restrictions based on availability, diligence, and materiality. 557 U.S. at 70. Milam, of course, has not been diligent, seeks previously available evidence, and cannot show that the DNA evidence was material to his conviction. To the extent that Milam has been denied discovery on any of these bases, that is consistent with *Osborne*.

In short, rather than supporting Milam's arguments, *Osborne* emphatically refutes them. Milam failed to state a claim upon which relief can be granted, and the district court's judgment denying relief was correct.

**C.    Milam does not have a plausible actual innocence claim based on the DNA evidence at-issue.**

Finally, Milam does not explain how the DNA evidence he seeks is crucial to bringing an innocence claim in state court. Even putting aside the DNA evidence presented at trial, it is beyond question that Milam and Jesseca are responsible for Amora's brutal murder—whether individually or as parties.[7] Amora was found dead in Milam's home, and he and Jesseca were the only people in the house with Amora in the hours before her dead body was reported to the police. 44 RR 138–40.[8] They were seen with Amora at 9 p.m. the night before the murder, 46 RR 96, and Milam called his sister at 9:30 a.m. the next day to tell her Amora was dead, 40 RR 180–82. Despite having already called his sister, Milam did not call 911 to report Amora's death until 10:37 a.m. 42 RR 103–15. Before calling 911, Milam and Jesseca went to a pawn shop, 42 RR 57–61, staged a crime scene in the house, 46 RR 180–83, and came up with

---

[7]    And even if, hypothetically, Milam was found guilty *only* through the law of parties, the evidence still fully supports his conviction and sentence.

[8]    "RR" refers to the "Reporter's Record," the state record of transcribed trial and punishment proceedings. "CR" refers to the "Clerk's Record" of pleadings and documents filed during Milam's trial. The state court records were filed in the federal district court during Milam's initial federal habeas proceedings. *See Milam v. Director*, No. 4:13-CV-545, ECF Nos. 33–37 (E.D. Tex.).

a now-discredited alibi, 40 RR 113–23. Milam told several different versions of the events to investigators. *See* 39 RR 229–31 (admitted as State's Exhibit "SX" 15); 59 RR SX F1 at 26–30, 33, 48–49 (pretrial hearing exhibit). And Milam confessed. Apart from Milam and Jesseca now accusing each other of sole responsibility, no other person has ever been credibly implicated, and Milam does not intend to implicate another person now. *See* ROA.47–48.

The recent recalculation of the DNA evidence in Milam's case also continues to forensically tie him to Amora's body. The report issued after the recalculation shows that as it relates to the sample taken from Amora's left elbow, Milam could still be included as a contributor, but now with a statistical probability of 1 in 492,000—significantly higher than the statistical probabilities attested to at trial. ROA.176; *see* 43 RR 136–37, 183–86. Jesseca is excluded entirely as a contributor to the same sample. ROA.176. The report further shows that a swab from Amora's chin, which was not discussed at trial, included Milam with a statistical probability of less than 1 in 10 trillion, while Jesseca was excluded. *Id*. Although this DNA evidence convincingly links Milam to the bitemarks,

it is only one piece of evidence supporting his conviction, and certainly not the deciding factor in determining his guilt.

Directly linking Milam to the crime was his confession to jail nurse, Shirly Broyles. Milam said: "I'm going to confess. I did it. But Ms. Shirley, the Blaine you know did not do this. . . . My dad told me to be a man, and I've been reading my Bible. Please tell Jesseca I love her." 40 RR 161–66.

Milam's clothing also directly forensically linked him to Amora. After discovery of Amora's body, the entire inside of Milam's shirt, the entire inside of his underwear, several spots on his jeans, the entire outside of one sock and part of the other, and Milam's entire jacket all tested presumptively positive for the presence of blood. 43 RR 39–42. Amora's DNA was found on a sample taken from the jeans he was wearing at arrest. 43 RR 119–20. Her DNA was also found on a sample swabbed from Milam's shirt and was thought to be a single-source sample with a statistical probability of 1 in 2.58 trillion Caucasians. 43 RR 116–19. Following recalculation, the likelihood of the shirt sample including Amora fell to a probability of 1 in 674 billion, but also included Milam, Carson, and Danny, each with the probability of 1 in 2. ROA.176. Even

with the knowledge that it was not a single-source sample, the recalculations still strongly suggest the blood belonged to Amora.

Further, Milam was observed at the pawn shop shortly before Amora's body was reported wearing jeans that were too large and obviously did not fit him, 42 RR 75–76, while a smaller-sized pair of bloodstained jeans were found discarded in the room where Amora was murdered.[9] *See* 42 RR 201–04, 229–30; 43 RR 73–75, 130–31; 48 RR 28–29. The bloodstain on the smaller jeans was described as "rather large," 46 RR 177–78; *see also* 44 RR 129 ("Nothing involved in this case had as much [bloodstain] as that pair of pants."), and primarily confined to the lap-area of the jeans, 43 RR 75. Crime scene investigator Noel Martin testified that he collected those jeans because they had stains "consistent with contact transfer bloodstains," a blood-spatter term of art meaning that "a bloodstain or a blood-soaked object which contained liquid blood on it at the time came in contact with the blue jeans, transferring blood to the surface of the jean." 42 RR 203–204, 229–30 ("[A] bloodied object come into contact with these jeans[.]"); 46 RR 177–78 (agreeing "contact transfer" from "direct contact with a blood object"). Martin agreed, the

---

[9]     Milam's weight was known to fluctuate. 39 RR 157; 44 RR 141–42.

"blood-soaked object" could be a child, 42 RR 204, and he expected to find Amora's blood on the jeans, 46 RR 178. DNA testing of a sample from the bloodstain did, in fact, match Amora. 43 RR 130–31. This evidence strongly suggests the person wearing the jeans sat a bleeding Amora on his lap and later changed out of the bloody jeans.[10] 56 RR 121–22.

Moreover, while in jail, Milam directed his sister to remove evidence from under his house that was later connected by trace-evidence analysis to other incriminating evidence found at the crime scene.[11] Under the house, police found a pipe-wrench in a plastic bag that had been shoved through a hole in the floor of the master bathroom. 40 RR 204–07; 41 RR 28–29; 44 RR 49–50. Forensic analysis revealed the components of Astroglide on the pipe-wrench.[12] 44 RR 153–54, 159–60. A

---

[10]    In closing argument, the State referenced video footage shown to the jury demonstrating that Jesseca was wearing the same clothing the night before and the morning after Amora's murder, *see* 48 RR 27–28, thus refuting any argument that Jesseca had been wearing the blood-soaked jeans.

[11]    Milam's sister testified that he asked her to retrieve a blue cellphone, but no cellphone was found. 40 RR 172–74, 185–87, 195–200; 52 RR 104.

[12]    While no blood was detected on the wrench and no DNA profile was obtained, 43 RR 50–52, 131, trial testimony revealed that silicone-based oil like that used in Astroglide is not water-soluble and would not wash off completely if put in water, 43 RR 174; 44 RR 166–67, while blood and DNA could wash off in water. 43 RR 166, 174.

bottle of Astroglide, babywipes, and a blood-stained diaper were all found in the room where Amora was murdered; the components of Astroglide were found on these items as well as on the diaper Amora was wearing when her body was found. 40 RR 185–87, 195–200, 204–07; 44 RR 49–50, 151–66. The diaper Amora was wearing was removed in the autopsy to reveal Amora's mutilated vagina and rectum. 41 RR 190. Both her vagina and rectum were torn to such an extent that there appeared to be one large opening instead of two, and the injury perforated internally and extended into her body cavity. 41 RR 191–92. The medical examiner stated that the injury was likely caused by the insertion of an object other than a penis hours before she died, 41 RR 191–96.

While DNA evidence corroborated the State's case against Milam, the very existence of twenty-four bitemarks on this child's bruised, battered, and mutilated body, coupled with the circumstantial evidence implicating Milam in this brutal murder, his considerable efforts to cover up his involvement and hide evidence after the fact, and his confession were all indicative of his guilt. As noted, Milam and Jesseca were the *only two people* who could have inflicted these injuries upon Amora the night of her murder. Even if DNA were excluded altogether, Milam still could

not demonstrate, by a preponderance of the evidence, that he would not have been convicted as either the primary perpetrator or as a party to this capital murder. Tex. Code Crim. Proc. art. 11.073(b)(2) and 11.071 § 5(a)(2); *see also* 4 CR 934 (jury charge on capital murder instructing jury to find beyond a reasonable doubt whether, acting alone or as a party, Milam caused Amora's death).

## II.    Milam Cannot Evade His Complaint's Procedural Defects.

As a preliminary matter, Jimerson's recent disclosure of over 4,000 pages of SWIFS's case records largely moots Milam's complaint.[13] But to whatever extent Milam's complaint is not moot, he cannot overcome its procedural defects. In dismissing Milam's civil suit, the district court agreed that the relief he seeks "sounds in mandamus," which a federal court lacks power to issue here. ROA.239. The Court should affirm the district court's decision on the basis that the relief Milam seeks amounts to impermissible mandamus. Alternatively, the Court may affirm the

---

[13]    Milam now explains how he believes the electronic data could assist him (however tenuously) in developing an actual innocence claim. DE18 at 30–33. Milam did not provide such specificity in his complaint, more definitive statement, or trial court motion. ROA.4–18, 43–59. In those pleadings, Milam only made general reference to the electronic data that he now suggests is the crux of his discovery request. *See id.*

district court's dismissal of Milam's complaint on the bases that Milam's lawsuit is barred by the applicable statute of limitations and the *Rooker-Feldman* doctrine. These alternative bases are supported by the record. *Davis*, 157 F.3d at 1005 ("[T]his Court may affirm a judgment upon any basis supported by the record.").

### A. The relief Milam seeks equates to impermissible mandamus.

In dismissing Milam's complaint, the court below agreed that the relief he seeks against Jimerson "sounds in mandamus." ROA.239. At bottom, Milam seeks to force Jimerson to obtain DNA records and turn them over.[14] The trial court denied Milam's attempt to do so. ROA.88. Milam's federal civil lawsuit is an improper request for mandamus relief regardless of whether he is challenging the trial court's decision denying him discovery of DNA records or Jimerson's decision not to voluntarily disclose DNA records.

---

[14] Milam quibbles with the district court's framing of the allegation as relating to Jimerson's "refusal to request the records." DE18 at 36 n.2. Instead, Milam insists that SWIFS is Jimerson's agent for the purposes of his case. Although SWIFS was utilized to conduct the testing in Milam's case during the investigation and presumably at the time of trial, it is far from clear whether any ongoing agency relationship exists. Regardless, Milam does not explain why it matters here, where Jimerson is not in possession of what Milam now seeks (electronic data) and would still need to request that material from SWIFS.

Where a plaintiff seeks an order compelling state officials "to comply with what [he] sees as the requirements of [state law], or to act so as to allow him independently to effectuate his rights under [state law]"—as Milam does now—the relief sought is "at its core, mandamus." *Pruett v. Choate*, H-17-2418, 2017 WL 4277206, at *5 (S.D. Tex. Sept. 25, 2017). Federal courts "lack the general power to issue writs of mandamus to direct state courts and their judicial officers in the performance of their duties where mandamus is the only relief sought," *Moye v. Clerk, DeKalb Cty. Superior Court*, 474 F.2d 1275, 1276 (5th Cir. 1973); *see also Conner v. Texas Court of Criminal Appeals*, 481 F. App'x 952, 953 (5th Cir. 2012) (unpublished). Thus, Milam's complaint was properly dismissed.

Milam contends that he is not seeking mandamus relief; rather, he is seeking injunctive and declaratory relief. DE18 at 34. In his view, characterizing his request as a request for a writ of mandamus would "transform every suit seeking injunctive relief against any state official into a request for a writ of mandamus." *Id.*

Jimerson does not contend that declaratory and injunctive relief is unavailable in all circumstances. But here, Milam's argument is that he has a due process right to limitless discovery implicitly derived from state

statute and caselaw permitting actual innocence claims. To vindicate this right (and in turn vindicate his right to raise an actual innocence claim), Milam would have a federal court require Jimerson to obtain DNA evidence from SWIFS and transmit it to Milam. Thus, regardless of whether Milam dresses up his request in procedural due process, he is, in substance, seeking to compel a state actor (a district attorney) to acquire documents to assist him in raising state-law-based actual innocence claims.

Not only should the Court reject Milam's attempt to micro-manage the district attorney, *see Johnson v. Collier*, 137 F.4th 376, 382 (5th Cir. 2025), but the Court lacks jurisdiction to grant the relief he seeks. *Ochoa v. Collier*, 802 F. App'x 101, 105 (5th Cir. 2020) ("[F]ederal courts do not have jurisdiction to issue the writ against a state actor or state agencies.") (unpublished); *see also Vela v. Ogg*, No. H-22-0803, 2022 WL 2785914, at *1–2 (S.D. Tex. June 8, 2022) ("Plaintiff's stand-alone request in the instant civil lawsuit for the Court to compel [the district attorney] to undertake new post-conviction DNA testing of biological material in his criminal case is in the nature of mandamus. . . . [The district attorney] is not an officer or employee of the United States or any federal agency, and

this Court lacks jurisdiction and authority to compel her by writ of mandamus to undertake updated forensic DNA testing.").

Accordingly, the district court correctly acknowledged that what Milam seeks is tantamount to mandamus relief. Because a federal court does not have the power to issue a writ of mandamus in a situation such as this one, the district court's dismissal of Milam's lawsuit should be affirmed.

## B.    Milam's lawsuit is time-barred.

Because § 1983 has no statute of limitation, Texas' two-year statute for personal-injury actions applies in Milam's case. *Reed v. Goertz*, 598 U.S. 230, 235 (2023); *Whitaker v. Collier*, 862 F.3d 490, 494 (5th Cir. 2017). The limitations period for a § 1983 claim "begins to run 'the moment the plaintiff becomes aware he has suffered an injury or has sufficient information to know that he has been injured.'" *Russell v. Bd. of Trustees*, 968 F.2d 489, 493 (5th Cir. 1992) (quoting *Rodriguez v. Holmes*, 963 F.2d 799, 803 (5th Cir. 1992)).

Here, Milam had sufficient information to know of his alleged injury when the State presented DNA evidence at trial; thus, the statute

of limitations has long run on his current due process claim.[15] In district court, Milam claimed his complaint was timely under the Supreme Court's recent decision in *Reed v. Goertz* because Jimerson's refusal to obtain and turn over SWIFS records is ongoing. ROA.201. But in *Reed*, the Supreme Court held that "when a prisoner pursues state post-conviction DNA testing through the state-provided litigation process, the statute of limitations for a § 1983 procedural due process claim begins to run when the state litigation ends." 598 U.S. at 237. The Court did not find that Reed's purported due process violation was ongoing despite Reed not receiving all his requested DNA testing. *Id.* at 235–36. Rather, the Court found that Reed's injury was complete when the state process for reviewing his claim concluded. *Id.*

Milam alternatively argued that, pursuant to *Reed*, the limitations clock should run from when the trial court denied his discovery motion.[16]

---

[15]    Even if Milam claimed his injury was not known until he obtained certain records through a file review in 2018, or until the CCA adopted various findings on his subsequent writ in 2020, he would still be time-barred. *See* DE18 at 6–8.

[16]    Milam's timebar argument undermines any insistence that his federal lawsuit has nothing to with the trial court's denial of his discovery motion. His assertion that the clock should run from when the trial court denied his discovery motion pleads him into a *Rooker-Feldman* hurdle he cannot overcome. *See* Section II.C., *infra*.

ROA.201. However, Reed sought testing through Chapter 64, an established state procedure for DNA testing. On the other hand, Milam ignored available State procedures; that is, he opted not to seek discovery through a subsequent state habeas application and instead sought jurisdictionally impermissible discovery in the trial court. Milam should not be permitted to argue his way around the statute of limitations based on his own mistake—pursuing court-ordered postconviction discovery in a trial court that had no jurisdiction to order postconviction discovery.

Again, Milam should have been aware of the inculpatory value of the DNA evidence since his trial over fifteen years ago. His lawsuit is time-barred.

## C.    The *Rooker-Feldman* doctrine precludes relief.

The *Rooker–Feldman* doctrine prohibits "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejections of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). When *Rooker–Feldman* applies, "lower federal courts are precluded from

exercising appellate jurisdiction over final state-court judgments." *Lance v. Dennis*, 546 U.S. 459, 463 (2006).

Here, Milam contested the district attorney's decision not to turn over DNA records in the convicting court. He lost. He now "seek[s] what in substance would be appellate review of the state judgment in a United States district court, based on [his] claim that the state judgment itself violates [his] federal rights." *Johnson v. De Grandy*, 512 U.S. 997, 1005–06 (1994). The *Rooker–Feldman* doctrine thus precludes Milam's lawsuit, which effectively asks a federal court to sit as an appellate court over the convicting court. *Benchoff v. Fogal*, 576 F. App'x 117, 118–19 (3d Cir. 2014) (applying the *Rooker-Feldman* doctrine where state court ruled it did not have jurisdiction to rule on plaintiff's postconviction motions and plaintiff sought declaratory relief that the ruling was incorrect).

In the court below, Milam argued *Rooker-Feldman* does not preclude relief because he is not contesting the trial court's ruling on his discovery motion. *See* ROA.202–06. But Milam is arguing that he has a due process right that operates to force the district attorney to obtain evidence for him on demand. That proposition was effectively rejected by the trial court's decision. A ruling by a federal court that such a right

exists cannot coexist with the trial court's ruling—such would effectively be an appellate decision overturning the trial court's order.[17]

## III.  The Court Should Deny a Stay of Execution.

Milam's motion for a stay of execution should be denied for multiple reasons. First, his motion is in violation of this Court's Rule 8.1.2. Second, the relevant equitable considerations weigh against him. He should not be permitted to further delay his execution.

### A.    Fifth Circuit Rule 8.1.2

Milam wholly failed to request a stay of execution in the district court. *See* ROA.4–245. Under Rule 8.1.2, which pertains to applications for immediate stays of execution, "[i]f the appellant raises an issue that was not raised before the district court or has not been exhausted in state court, the applicant must give the reasons why prior action was not taken and why a stay should be granted." Milam does not provide a reason as to why he did not request a stay in district court.[18] At best, he claims that had Jimerson provided the records he seeks during the district court

---

[17]    It us unclear whether the district court rejected Jimerson's *Rooker-Feldman* argument. *See* ROA.231–32 n.3.

[18]    Milam likewise did not request a stay from the trial court. *See* ROA.51–59. He now fails to explain why. DE20-1.

litigation, he would not now be seeking a stay. Motion for Stay of Execution (DE20-1) at 8. This justification is illusory; it defies logic that Milam had a reasonable expectation that Jimerson would request, obtain, and turn over the very records that were the subject of the litigation. Milam could have filed a motion for a stay in district court. He did not. He now provides no compelling reason as to why. Thus, his motion for a stay is in violation of this Court's rules and should be denied.

## B.    The relevant considerations weigh against granting Milam a stay of execution.

A request for a stay "is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (citing *Nelson v. Campbell*, 541 U.S. 637, 649–50 (2004)). When the requested relief is a stay of execution, a court must consider:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

40

*Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). An inmate must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits. *Hill*, 547 U.S. at 584 (citing *Barefoot v. Estelle*, 463 U.S. 880, 895–96 (1983)). Furthermore, a court "must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing [his] claim." *Nelson*, 541 U.S. at 649–50.

As demonstrated above, Milam fails to state a claim for which relief can be granted and his complaint suffers from procedural defects that preclude a federal court from granting him the relief he seeks. Thus, he cannot demonstrate the likelihood of success on the merits of his claim on appeal. This alone is sufficient to deny Milam's motion for a stay. *See Adams v. Thaler*, 679 F.3d 312, 320 (5th Cir 2012) (without addressing *Nken*'s other considerations, finding the district court abused its discretion by granting a stay when the inmate had not made a showing of a likelihood of success on the merits).

Furthermore, while "the death penalty itself is irreversible, there comes a time when the legal issues have been sufficiently litigated and

re-litigated so that the law must be allowed to run its course." *United States v. Vialva*, 976 F.3d 458, 462 (5th Cir. 2020) (quotation and citation omitted). Milam has challenged his conviction for well-over a decade. He has pursued relief in state and federal court multiple times. He has been given the opportunity to litigate his conviction and his claims regarding intellectual disability twice, including an evidentiary hearing. The legal issues in his case have been sufficiently considered by the courts and the law should be allowed to run its course.

A federal court must also consider "the State's strong interest in proceeding with its judgment and . . . attempt[s] at manipulation." *Nelson*, 541 U.S. at 649. Indeed, "there is a strong presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Id.* at 650.

Here, Milam's request for a stay is plainly dilatory. Despite insisting he "has repeatedly attempted to gain access to a complete set of DNA records for years," DE20-1 at 8, the record shows otherwise. Even by Milam's own account, he did not request the records he does today

until 2024, and even then, he requested the records through SWIFS.[19]
*See* ROA.12–13. Milam admits he did not request the complete SWIFS's
DNA records from Jimerson until April 8, 2025. ROA.13–14. Thus, the
request at the center of his current complaint came nearly fifteen years
after his conviction, after the disposition of his initial state habeas
application, after the state court's consideration of multiple subsequent
state habeas applications, and after the trial court set his third execution
date.

Further, "[b]oth the State and the victims of crimes have an
important interest in the timely enforcement of a sentence." *Hill*, 547
U.S. at 584. "Last-minute stays should be the extreme exception, not the
norm[.]" *Bucklew v. Precythe*, 587 U.S. 119, 150 (2019)*; see also Barr v.
Lee*, 591 U.S. 979, 981 (2020). Milam insists any harm to the State or the

---

[19]    Milam contends that he requested certain DNA files in 2018, 2024, and
2025. DE20-1 at 6. Jimerson is unaware of any specific request for SWIFS
records from the State in 2018 apart from the general request to review the
State's files, at which time SWIFS records were obtained. Milam claims that
he requested and received records from SWIFS in 2018, but it is unclear if he
requested the electronic data at this time. *See* n.1, *supra*. Milam has presented
no proof of his 2018 request. Regardless, this position contradicts Milam's prior
position that as late as 2019, he thought the DNA evidence was immaterial to
his conviction. ROA.10–11.

victims is mitigated because a stay is "only a temporary measure[.]"[20] DE20-1 at 4. But further delay of his execution would "work[] a 'miscarriage of justice'" on the State and the victims. *Price v. Dunn*, 587 U.S. 999, 1008–09 (2019) (Thomas, J., concurring). Milam's challenges to his death sentence have persisted since 2010 and he has successfully stayed two previously set execution dates. The prior delays in his execution have proven to be more than temporary and he should not be further permitted to litigate evidence he has been aware of since trial— evidence that would not prove his innocence, especially given his argument that such evidence was expected to be found.[21]

Milam's § 1983 complaint was properly dismissed, and he cannot make a strong showing that he is likely to succeed on the merits of his appeal. Moreover, when considering the significant delay in Milam's

---

[20]    Milam contends that the State is "proceeding with his execution despite significant questions regarding [his] guilt." DE20-1 at 5. But regardless of the DNA evidence, there are no questions of Milam's guilt. *See* Section I.C., *supra.*

[21]    Furthermore, Milam has already filed in the CCA a 112-page subsequent writ application, with 573 pages of exhibits, a substantial portion of which is dedicated to the DNA claims. The writ includes claims of actual innocence, new scientific evidence, a due process violation, and presentation of false testimony—all relying on "new" DNA evidence. Given his position that DNA is irrelevant because of his proximity to the victim and the expectation that his DNA would be found, it is unclear what *more* DNA records and evidence would prove at this late date.

current request for DNA records—and in turn his bringing of the instant civil lawsuit—he cannot overcome the strong presumption against granting a stay. He also cannot demonstrate that the balance of equities falls in his favor. Milam tortured and mutilated a thirteen-month-old baby, in an attack that lasted hours before Amora finally died from her injuries. Milam confessed, and no other suspect—aside from Jesseca, who the State agreed was an accomplice and who was convicted in her own trial—has ever been implicated. It is long past time for Amora and her family to receive the justice they deserve. Milam is not entitled to a stay of execution.

## CONCLUSION

For the above reasons, Jimerson requests that this Court affirm the district court's judgment and deny Milam's motion for a stay of execution.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General

for Criminal Justice

s/ TOMEE M. HEINING
TOMEE M. HEINING
Chief, Criminal Appeals Division
Assistant Attorney General/
Assistant District Attorney
Texas Bar No. 24007052
      *Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936–1600
Fax: (512) 320–8132
Email: tomee.heining@oag.texas.gov

*Attorneys for Defendant–Appellee*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I do hereby certify that this brief complies with Fed. R. App. Proc. 32(a)(7)(c) in that it contains 9,942 words, Microsoft Word 365, Century Schoolbook, 14 points.

s/ TOMEE M. HEINING
TOMEE M. HEINING
Assistant Attorney General/
Assistant District Attorney

## CERTIFICATE OF COMPLIANCE WITH ECF FILING STANDARDS

I do hereby certify that: (1) all required privacy redactions have been made pursuant to Fifth Circuit Rule 25.2.13; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus-scanning program and is free of viruses.

s/ TOMEE M HEINING
TOMEE M. HEINING
Chief, Criminal Appeals Division
Assistant Attorney General/
Assistant District Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the electronic case-filing (ECF) system of the Court. The ECF system sent a "Notice of Electronic Filing" (NEF) to the following attorneys of record:

Jeremy Schepers
Supervisor, Capital Habeas Unit
Office of the Federal Public Defender
525 S. Griffin St., Ste. 629
Dallas, Texas 75202
Jeremy_schepers@fd.org

Emily Folansbee
efollansbee@texasdefender.org
Jared Tyler
jptyler@texasdefender.org
TEXAS DEFENDER SERVICE
P.O. Box 82236
Austin, Texas 78708

s/ TOMEE M. HEINING
TOMEE M. HEINING
Chief, Criminal Appeals Division
Assistant Attorney General/
Assistant District Attorney